**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**DEIDRE L. MONROE**
Public Defender's Office
Gary, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**ALEJANDRO ROSILLO**
DCS, Lake County Office
Gary, Indiana

ATTORNEY FOR COURT APPOINTED
SPECIAL ADVOCATE:

**DONALD W. WRUCK**
Wruck Paupore PC
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE THE INVOLUNTARY TERMINATION
OF THE PARENT-CHILD RELATIONSHIP OF
S.H. and E.H.:

N.H.,

    Appellant-Respondent,

        vs.

THE INDIANA DEPARTMENT OF CHILD
SERVICES,

    Appellee-Petitioner,

    and

LAKE COUNTY COURT APPOINTED
SPECIAL ADVOCATE,

)
)
)
)
)
)
)
)
)
)
)
)    No. 45A03-1207-JT-313
)
)
)
)
)
)
)
)
)
)
)
)
)
)

---

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Mary Beth Bonaventura, Judge
Cause No. 45D06-1104-JT-99
Cause No. 45D06-1104-JT-100

---

**March 4, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

N.H. (Father) appeals from the involuntary termination of his parental rights to his children, S.H. and E.H. Father challenges the sufficiency of the evidence supporting the trial court's termination order.

We affirm.

The State filed a Petition Alleging A Child to be in Need of Services (CHINS Petition) for both S.H. and E.H. A detention hearing was held, at the conclusion of which the juvenile court continued the detention of the children, ordered the parents to participate in services, and entered a denial of the allegations on the part of the parents. On December 18, 2009, the juvenile court found S.H. and E.H. to be CHINS after Mother and Father admitted to the allegations in the CHINS Petitions. The juvenile court then proceeded to disposition and entered its dispositional decree and parental participation decree.

On April 9, 2010, August 16, 2010, and November 10, 2010, the juvenile court held a review hearing where the permanency plan was maintained in an attempt to reunify the children with their parents. On February 4, 2011, the juvenile court suspended the parents'

visitation with S.H. and E.H. on the recommendations of the LCDCS and the court appointed special advocate (CASA). On February 23, 2011, the juvenile court held a review hearing during which the Lake County Department of Child Services (LCDCS) recommended a permanency plan terminating the parental rights of Mother and Father to S.H. and E.H. and to pursue foster parent adoption. The trial court took that recommendation under advisement and then entered its order to that effect on February 25, 2011.

On April 1, 2011, the LCDCS filed its petitions for the termination of parental rights, and an initial hearing on those petitions was held on June 29, 2011. On April 18, 2012, the juvenile court held an evidentiary hearing on the termination petitions, at which Father and Mother appeared with counsel. The court took the matter under advisement, issuing its dispositional order on May 24, 2012 terminating the parental rights of Father and Mother as to S.H. and E.H.

Father is the biological father of S.H., born in October 2005 and E.H., born in May 2008.[1] The facts most favorable to the trial court's judgment reveal that on November 11, 2009, LCDCS received a referral regarding S.H. and E.H., who at the time were ages four and one, respectively. The children had been present in the home when Mother struck Father on the head with a lamp during a domestic disturbance between the two. Father was taken to the hospital where he received stitches for his injuries. LCDCS Family Case Manager (FCM) Veronica Martinez interviewed Mother and Father at the hospital. FCM Martinez

---

[1] The parental rights of S.H. and E.H.'s biological mother, M. H. (Mother), were involuntarily terminated by the trial court in its May 2012 termination order. Mother does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Father's appeal.

went to the home and found it to be filthy, filled with trash, and infested with cockroaches. The children had not been bathed and had dirt on their faces, hands, legs, and feet. The condition of the home was such that the children would have been removed on that basis alone.

S.H. and E.H. were removed from the home and placed in Carmelite Home on November 11, 2009 due to the domestic violence that had occurred and health and safety issues. At the detention hearing during which the children were made temporary wards of the State, the trial court ordered both parents to submit to a psychological evaluation, submit to drug and alcohol evaluations, attend parenting classes, individual and family counseling for domestic violence, and supervised visitation. On December 18, 2009, the children were made wards of the State retroactively to November 11, 2009. The children had not been returned to the care of either parent.

The original case plan for the family was reunification. Father completed some services, including parenting classes and ten sessions of individual therapy. Father attended family therapy with Mother in addition to submitting to a psychological evaluation and drug and alcohol assessments. During Father's psychological evaluation, Father revealed that he had a history of sexual abuse as both a victim and a perpetrator. Father alleged that he had been inappropriately touched by his grandfather, but that no charges were brought against the grandfather. Father was convicted at the age of seventeen after inappropriately touching a young boy. Father failed to comply with the terms of his probation and was incarcerated at the age of twenty-three. Father is a registered sex offender.

The main recommendations that were made after Father's completion of the psychological evaluation on November 30, 2009, were as follows: 1) Individual therapy to address depression and possible pain from medical issues; 2) anger management counseling; 3) parenting classes; 4) address issues of self-obsession and dependency on others; 5) marital counseling due to relationship issues with Mother, his wife; 6) expert sexual offender evaluation to gauge the potential for future sexual abuse perpetration; 7) learning to care for himself before reunification with and care of the children; and 8) reunification with children after adequate progress in therapy, progress with sexual abuse issues, and economic and emotional adjustment.

Case Manager Melissa Humpher recommended that Father complete a psychosexual evaluation because she believed it was necessary for his reunification with the children. Humpher testified that the psychosexual evaluation would accurately assess Father's needs concerning therapy and rehabilitation. Father was referred to Dr. Tiffany Simpson for the evaluation and he agreed to undergo the evaluation in February 2010. Although Father testified at the fact-finding hearing that he completed the evaluation with Dr. Simpson, Dr. Simpson informed Humpher that Father failed to complete the evaluation. Father told Humpher that he would complete a psychosexual evaluation on his own with another agency. Father also claimed that he was ordered to undergo sex offender therapy when he was incarcerated, and agreed in March 2010 to obtain verification. Father failed to provide Humpher or his subsequent case manager, Anabel Quiroz-Aguilar, with the necessary verification information.

Both parents attended therapy to address the domestic violence issues present in their relationship, but they were not progressing in their therapy. The violence in the relationship escalated such that Father attempted to choke Mother in May 2010. Father and Mother argued during supervised visitation with their children, and that behavior negatively affected their children's behavior. In particular, S.H. began exhibiting aggressive behavior and would often push and hit his sister, E.H. S.H.'s aggressive behavior would escalate immediately following visitations with Father and Mother.

After their initial placement in Carmelite home, the children were placed in two foster homes prior to their current placement with foster parents in a pre-adoptive home on December 6, 2010. The behavior that led to the children's removal from the two prior foster homes included S.H. ripping the television off the wall, tearing his room apart at night, and urinating on the floor, his coat, and towels.

Father's visitation was stopped in January 2011 when the foster parents reported the following about the children's behavior: 1) S.H. placed a stick in the dog's anus and touched the dog's penis; 2) S.H. asked Foster Mother if the dog was allowed to lick his privates; 3) S.H. masturbated very often at bedtime, bath time, and in the living room; 4) E.H. had to be taken to the emergency room because she was holding her vagina and buttocks, yelling and crying "ouchie" after a visit from Father and Mother during which Father was briefly left alone with her; 5) S.H. opened his legs and told E.H. to touch him when they were both at daycare; and 6) S.H. explained to Foster Mother that he engaged in the behavior at daycare because "old dad" made him do that.

6

LCDCS received the report regarding sexual abuse of S.H. by his Father. When S.H. and E.H. were at daycare, S.H. asked his sister, E.H. to touch his genitals. On two separate occasions, S.H. told the case manager and Foster Mother that Father used to ask S.H. to touch his genitals. S.H. touched his penis in order to show Humpher what he did at the daycare with E.H. S.H. identified Father as "old daddy" and explained that he did this "[b]ecause old daddy did it." *Transcript* at 62. Humpher did not believe that sexual abuse occurred in a foster home or the Carmelite Home because S.H. consistently claimed Father was the perpetrator.

When the matter was subsequently investigated at the FAB Center, and during his forensic interview observed by Humpher and a detective, S.H. became very anxious, climbed the furniture, asked for something to drink, and in general did not cooperate. At one point, S.H. climbed over the interviewing detective and put his hands on the detective's genitals. The detective told Humpher that he had never been touched by a child before and that the child would likely become a perpetrator himself and soon. Because there were no eyewitnesses to acts of sexual abuse alleged by S.H. and because Father denied the allegations, the allegations were classified as unsubstantiated.

In March 2011, Mother, maternal aunt, and maternal grandmother confessed that they knew Father touched S.H. prior to the involvement of the LCDCS because S.H. had told them. Mother also described an incident where Father took E.H. to the bedroom, locked the door, and Mother could hear E.H. screaming. Mother pounded on the door in an attempt to stop Father, but was told to mind her own business. Father threatened to harm Mother so she

7

did not report the incident. FCM Quiroz-Aguilar believed that Mother was not capable of protecting the children from further abuse.

In October 2010, Father participated in some therapy, but struggled to apply what he had learned and displayed tendencies to be dishonest. Although Father was receiving some therapy to address his sexual abuse history, the lack of the psychosexual evaluation prevented Father from receiving more tailored treatment to rehabilitate Father. Ultimately, the juvenile court terminated Father's parental rights to S.H. and E.H. Father now appeals the juvenile court's order terminating his parental rights.

Initially, we note that when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denie*d. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the trial court's decision, we must affirm. *Id*.

Here, the trial court made detailed findings in its order terminating Father's parental rights. Where the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id*. "Findings are clearly

8

erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the trial court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98.

The traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144 (Ind. Ct. App. 2008). In addition, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> . . .
> (C) that termination is in the best interests of the child. . . .

Ind. Code Ann. § 31–35–2–4(b)(2) (West, Westlaw current through 2012 2nd Reg. Sess.). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260–61 (Ind. 2009)

(quoting Ind. Code Ann. § 31–37–14–2 (West, Westlaw current through 2012 2nd Reg. Sess.)). If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. I.C. § 31–35–2–8 (West, Westlaw current through 2012 2nd Reg. Sess.).

Father concedes that both S.H. and E.H. have been removed from the parent and have been under the supervision of the LCDCS for at least fifteen months of the most recent twenty-two months, beginning with the date the children were removed as the result of the CHINS determination. *See* I.C. § 31-35-2-4(b)(2)(A)(iii). Likewise, Father concedes that there is a satisfactory plan for the care and treatment of S.H. and E.H. by foster parents who wish to adopt them. *See* I.C. § 31-35-2-4(b)(2)(D). Furthermore, Father does not challenge the juvenile court's findings of fact. Rather, Father challenges the weight given to the facts and the legal conclusions drawn by juvenile court's dispositional order.

Father contends that the juvenile court erred by concluding from the facts presented at the evidentiary hearing that there was a reasonable probability that the conditions resulting in S.H.'s and E.H.'s removal or placement outside the parents' home will not be remedied. He claims that the juvenile court "failed to give any weight to testimony that father completed parenting classes[,] counseling, home base[d] services, individual counseling, domestic violence counseling, psychological evaluation and completed his psychosexual evaluation." *Appellant's Brief* at 10. Father further contends that the juvenile court failed to consider the evidence that Father and Mother were divorced and Father was living in Kentucky at the time

of the evidentiary hearing, and "failed to give any weight to the fact that he had complied in totality with his case plan." *Id*. at 11.

When determining whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside the home will not be remedied, the juvenile court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *M.M. v. Elkhart Office of Family & Children*, 733 N.E.2d 6 (Ind. Ct. App. 2000).

Father's argument with respect to the juvenile court's finding appears to be a request for this court to reweigh the evidence, a task we are forbidden to undertake. The trial court acknowledged that Father did complete some of the services provided for him, but he was not progressing in those services. Father did testify that he had completed the psychosexual evaluation necessary for reunification with the children; however, Humpher testified that Father had not completed the evaluation. The juvenile court was thus left with a credibility determination, which we will not disturb on review.

We do not agree with Father that the juvenile court's conclusions were clearly erroneous. The record reveals that S.H. was acting out in a sexually inappropriate manner and displayed anger issues, which we have set forth in detail above. S.H. would act out aggressively against E.H., his sister, after visitations with Mother and Father. That behavior

11

has been greatly reduced since visitation with the parents has ceased. Foster Mother testified that the children are thriving in their pre-adoptive foster home and have bonded with those family members.

Neither Mother nor Father was providing emotional or financial support for the children and neither parent was in a position to properly parent the children. At the time of the evidentiary hearing, Father and Mother were divorced and Mother had remarried. The domestic violence between the two, however, continued after the dissolution of their marriage, with Father threatening to kill Mother, her new husband, and the maternal grandmother. Mother obtained a protective order against Father because of those threats and his threat to burn down their house. In 2012, Father was living in a trailer park in Kentucky where both the paternal grandfather and paternal great-grandfather live. Father was concerned with the option of placing S.H. and E.H. in the paternal grandmother's home in Kentucky, because Father alleged that paternal grandfather was an abusive alcoholic who had molested a child without being prosecuted. The juvenile court's conclusion that there was a reasonable probability that the conditions resulting in S.H.'s and E.H.'s removal or placement outside the parents' home will not be remedied was supported by the findings which were established by clear and convincing evidence.

Father also challenges the juvenile court's conclusion that a continuation of the parent-child relationship posed a threat to the well-being of S.H. and E.H. Father contends that the juvenile court "failed to mention or give any credit to [Father's], suitable housing, parenting classes completion, completing counseling, consistent visitation, consistent court

attendance, employment status, and completion of his psychological evaluation." *Appellant's Brief* at 11.

The record reveals that certain conditions in the parent-child relationship remained unchanged. In particular, Father was a registered sex offender and S.H. identified Father as his perpetrator. S.H.'s inappropriate sexual behavior resulted from his exposure to sexual abuse. Father never supplied evidence of his completion of sexual offender treatment and failed to comply with a psychosexual assessment. Father continued to threaten Mother with violence post-dissolution, and the negative behavior exhibited by the children after visits with their parents stopped once visitation was ceased. S.H. and E.H. were exposed to harm while they remained in Father's care. "When the evidence shows that the emotional and physical development of [] child[ren] in need of services is threatened, termination of the parent-child relationship is appropriate." *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). The juvenile court's conclusion is supported by the findings, which were established by clear and convincing evidence.

Father also argues that the juvenile court's conclusion that termination of his parental rights to S.H. and E.H. would be in their best interests is clearly erroneous. Father supports this argument by stating that "[t]he trial court failed to address the pain and suffering that these children will have to endure, when they realize that they will never see their parents again. . . . Certainly, mental abuse is not in the best interest of S.H. and E.H. . . ." *Appellant's Brief* at 11.

13

The evidence established that FCM Quiroz-Aguilar believed that termination of parental rights and adoption by the current foster family was in the best interests of S.H. and E.H. She supported her opinion by the evidence of Father's unresolved sexual abuse issues and lack of progress in the services provided. S.H.'s behavior greatly improved after the visits with Mother and Father stopped in January 2011, and the instances of S.H.'s sexually inappropriate behavior had greatly reduced while in his current placement. S.H. is receiving therapy and the foster parents have a safety plan in their home in order to prevent S.H. from being unsupervised with his little sister, E.H. The foster parents wish to adopt S.H. and E.H.

When E.H. was placed with her current foster family she was two and one-half years old and could not speak. Since living with her foster parents, E.H., who is now four years old, can speak and read. At the time of the hearing, S.H.'s sexual behavior had decreased from approximately eight instances per day to two incidents in the past four months. A bonding assessment revealed that S.H. and E.H. perceive the foster parents to be their parents. Mother admitted at the hearing that the foster parents are the only parents the children know.

At the time of the evidentiary hearing, Father was receiving SSI disability benefits and was living in a two-bedroom mobile home trailer in Kentucky near his family members. Father's family has a history of physical and sexual abuse.

A juvenile court must subordinate a parent's interests to those of the child. *In re J.S.*, 906 N.E.2d 226 (Ind. Ct. App. 2009). S.H. and E.H. have been in foster care since November 12, 2009 and have thrived in that environment. They have bonded with the

members of a foster family who wish to adopt them. The juvenile court's conclusion that termination of the parent-child relationship is in the best interest of S.H. and E.H. is supported by the findings, which were established by clear and convincing evidence. Father has failed to demonstrate how termination of his parental relationship with S.H. and E.H. would constitute either mental abuse or clear error.

We will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to S.H. and E.H. was clearly erroneous. We therefore affirm the juvenile court's judgment.

Judgment affirmed.

NAJAM, J., and BRADFORD, J., concur.